
# ARKANSAS COURT OF APPEALS

DIVISIONS I, II, and IV
**No.** CR–15–301

| | | |
|---|---|---|
| CALVIN CARRICK | | **Opinion Delivered** March 9, 2016 |
| | APPELLANT | |
| | | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, FIFTH DIVISION |
| V. | | [NO. 60CR–13–510] |
| STATE OF ARKANSAS | | |
| | APPELLEE | HONORABLE WENDELL L. GRIFFEN, JUDGE |
| | | REVERSED AND DISMISSED |

**BART F. VIRDEN, Judge**

Pro se appellant Calvin Carrick appeals from the Pulaski County Circuit Court's order holding him in criminal contempt for disobeying a court order that he hire an attorney; displaying disorderly, contemptuous, and insolent behavior; and disobeying and resisting the court's "jury-trial process." Carrick argues that the trial court erred in finding him in contempt. We agree and, therefore, reverse and dismiss.

## I. *Background*

These are the facts leading up to the criminal-contempt finding. Carrick had appealed to the circuit court from convictions in the district court and requested a jury trial.[1] On the day set for trial, the court found that Carrick had knowingly and voluntarily waived his right to counsel. After a preliminary discussion about jury instructions, during which Carrick grew

---

[1]The parties agree that Carrick's underlying charges were ultimately nolle prossed.

SLIP OPINION

increasingly frustrated, Carrick said, "[I]f there's some sort of legal reason that you can find that you cannot instruct the jury on what the legislature has wrote in the law, then I'm going to need a lawyer because I don't understand what's going on." The following colloquy occurred:

COURT: Mr. Carrick, the Court will have to reschedule this trial so you can get a lawyer.

APPELLANT: I'm sorry about that, but this is—

COURT: No, no, no.

APPELLANT: This is crazy.

COURT: No, sir, it's not crazy. This is the law. Let me be real clear to you. There's a reason why people go to law school. There's a reason why you go to medical school. There's a reason why you go to engineering school. Those skills affect public safety and public security and anybody can't, as Grandma Bell used to say, up and do this.

This isn't like shooting pool or shooting marbles where you can just have a thumb and a set of marbles and make it into the game.

People go to law school for three years. Then they have to pass a bar exam to show they know the law. Jury instructions are part of how trials are made before juries and just because you can find a statute on the internet doesn't mean that the whole statute goes into the trial. If some part of the statute doesn't apply, it does not go into the trial. It's the law, but it's not the law in that case and so it's not crazy.

APPELLANT: Is there some part that you're saying that I did like that, that did not apply?

COURT: Mr. Carrick, we have done all we need to do. You have asserted your right to counsel.

The trial court then dismissed the jury with no objection by the State and asked Carrick whether he could retain an attorney within thirty days. Carrick answered affirmatively.

2

At a report–on–attorney hearing, Carrick appeared without an attorney and explained

that he could not agree to the requested fee. The following colloquy was had:

COURT: Let me ask the public defender to talk to you and let me tell you whether or not you would qualify. If you don't qualify, then I will give you another chance to get a lawyer, but I need to inform you that we need to get this matter moving and so you will get a lawyer and we will proceed or you will get a court-appointed lawyer and proceed, but we will proceed, sir.

APPELLANT: Yes, sir, I certainly do want to proceed and I decided to continue to represent myself.

COURT: We've been down that road before. You recall I had a jury trial scheduled. I had a jury come in. We were ready to begin the jury trial on the day of trial and that was when you finally realized that you needed a lawyer. I'm not going down that road again.

APPELLANT: No, sir. What I—

COURT: Excuse me. So you will have a lawyer one way or another, Mr. Carrick. You're going to have a lawyer court-appointed or you're going to have a lawyer hired, but you're not going to represent yourself, sir.

APPELLANT: I'm not sure how that's going to work then because that's my intent.

COURT: Well, folks that go to hell intend to go to heaven, but that doesn't keep them from going to hell, okay? So let's get something straight. I really don't care what you intend.

APPELLANT: That's fine.

. . . .

COURT: You will not represent yourself and the reason for that is—I've made a record—you do not know the law. You do not know court procedures. You don't know how to do jury instructions. You've asked for a jury trial and I'm not going to have you messing up a jury trial just because you want to represent yourself. You have the right to believe you're smart to represent yourself, but you're just as wrong as Lucifer

3

on Judgment Day. So that will be the end of that. Have a seat.

APPELLANT: So I may not speak?

COURT: No, sir. Have a seat.

APPELLANT: Okay. All right.

Following a discussion about Carrick's reluctance to sign an affidavit indicating that he was requesting an attorney, the public defender reported that Carrick felt that he could afford to hire an attorney. The following was said:

COURT: Well, I appreciate Mr. Carrick's devotion to truth. Well, Mr. Carrick, I'm going to give you one week to find a lawyer. . . .

COURT: Mr. Carrick, come back in a week with a lawyer since you say you are able to afford one, but come back in one week one way or [another].

APPELLANT: I will come back one way or the other, sir.

COURT: Thank you, sir.

At the next report-on-attorney hearing, the following colloquy occurred:

APPELLANT: I don't have a lawyer, Your Honor, I'm representing myself.

COURT: No, you're not. We plowed that field . . .. I've ruled that you're incompetent to represent yourself. You will not represent yourself.

The next question is what will happen. I have previously directed you to talk with the public defender and you said you were not willing to take a public defender.

I am going to have you sit down with the public defender again and have the public defender do an assessment of your means.

Mr. Thompson, you will sit down with Mr. Carrick and assess his means and whether he qualifies for a public defender.

APPELLANT: Your Honor—

COURT:      Do not [interrupt] me, Mr. Carrick, when I'm talking. I will not tell you this one other time. The next time you do that, I will have you gagged.

. . . .

COURT:      Mr. Carrick, I don't care if you request a lawyer or not. Under the Constitution of the United States, which out ranks [sic] you, I have the authority to appoint a lawyer for you and, sir, I promise you, I am going to exercise every iota of the authority I have. You will not leave this courthouse without a lawyer today. And you, sir, can be assured of that. We're in recess for 15 minutes.

APPELLANT:  Will the Court review the case of *Faretta* during a recess?

COURT:      No, sir.

APPELLANT:  It's a Supreme Court—

COURT:      Excuse me, sir. I am not reviewing any case unless your lawyer submits it to me. You want me to review something, get a lawyer.

After additional questions concerning Carrick's assets, the trial court determined that Carrick was not indigent. Upon determining that Carrick was not entitled to a court-appointed attorney after all, the judge, noting that he had "previously ordered [Carrick] to present [himself] [there] with counsel," held Carrick in contempt. In a written order, the trial court found that, not only had Carrick disobeyed a lawful order to hire counsel, he had exhibited disorderly, contemptuous, and insolent behavior and that he had willfully resisted and disobeyed the court's "jury-trial process."

## II.  *Criminal Contempt*

Every court of record shall have the power to punish, as for criminal contempt, persons guilty of the following acts and no others: (1) disorderly, contemptuous, or insolent behavior committed during the court's sitting, in its immediate view and presence, and

directly tending to interrupt its proceedings or to impair the respect due to its authority; (2) any breach of the peace, noise, or disturbance directly tending to interrupt its proceedings; (3) willful disobedience of any process or order lawfully issued or made by it; (4) resistance willfully offered by any person to the lawful order or process of the court; and (5) the contumacious and unlawful refusal of any person to be sworn as a witness and when so sworn a similar refusal to answer any legal and proper interrogatory. Ark. Code Ann. § 16-10-108(a) (Repl. 2010). Section 16-10-108(c) provides that contempt committed in the immediate view and presence of the court may be punished summarily, but that, in other cases, the party charged shall be notified of the accusation and shall have a reasonable time to make a defense. *See, e.g.*, *Allison v. DuFresne*, 340 Ark. 583, 12 S.W.3d 216 (2000).

Although the trial court treated this as direct criminal contempt—given the summary punishment—it was, in fact, indirect criminal contempt because, to the extent that the trial court believed it had issued a definite order, Carrick's failure to hire and return to court with an attorney was not committed in the immediate view and presence of the court. The trial judge would have had to consider extrinsic evidence not within his personal knowledge and observations to determine the willfulness of Carrick's actions. *See generally* John E. Theuman, Annotation, *Attorney's Failure to Attend Court, or Tardiness, as Contempt*, 13 A.L.R.4th 122, 163–64 (1982). Because Carrick's actions would have required proof to establish his mental state, it was indirect criminal contempt; however, Carrick does not challenge on appeal the lack of notice and opportunity to be heard. *See, e.g.*, *Ark. Dep't of Human Servs. v. Shipman*, 25 Ark. App. 247, 756 S.W.2d 930 (1988). Therefore, we do not address this aspect of the



criminal–contempt finding.

Here, the trial court found in its written order that Carrick had willfully resisted and disobeyed a lawful order by refusing to obtain counsel; that he had exhibited disorderly, contemptuous, and insolent behavior; and that he had willfully resisted and disobeyed the court's jury-trial process. In a review of a case of criminal contempt, we view the record in the light most favorable to the trial judge's decision and sustain that decision if it is supported by substantial evidence. *Atkinson v. Lofton*, 311 Ark. 56, 842 S.W.2d 425 (1992).

### A.   There Was No Decisive Order Definite in its Terms

Before a person may be held in contempt for violating a court order, the order must be in definite terms as to the duties imposed on him, and the command must be express rather than implied. *Hodges v. Gray*, 321 Ark. 7, 901 S.W.2d 1 (1995). Given the inconsistency between the trial court's oral instruction that Carrick return to court with hired counsel and its continued assessment of Carrick's indigent status to determine whether an attorney could be appointed, the trial court's directive was not entirely clear. The dissent characterizes the trial court's instruction as an "expressly defined command," yet the colloquies, at a glance, show that the trial court said the following:

> (1) "you will need to get a lawyer and we will proceed or you will get a court-appointed lawyer and proceed,"
>
> (2) "you will have a lawyer one way or another,"
>
> (3) "[y]ou're going to have a lawyer court-appointed or you're going to have a lawyer hired,"
>
> (4) "come back in a week with a lawyer since you say you are able to afford one, but come back in one week one way or [another]," and

7

(5) "[y]ou will not leave this courthouse without a lawyer today."[2]

The only thing that is clear from the various directives given is that the judge adamantly refused to allow Carrick to represent himself because he had no legal knowledge or skill.

Even assuming that the trial court had issued a decisive order that Carrick hire an attorney,[3] we are convinced that this case presents an exception to the general rule regarding contempt, which is that this court "will not look behind the order to determine whether it is valid." *James v. Pulaski Cty. Circuit Court*, 2014 Ark. 305, at 4–5, 439 S.W.3d 19, 23. While the dissent relies on this general rule, we note that there is an exception to the general rule: "If the contemnor was making a legitimate and successful challenge to the validity of the

---

[2]The colloquies more accurately reflect what was said, as opposed to the *subsequently* entered contempt order relied on by the dissent.

[3]Even if the trial court's directives had been clear, there is some question whether an order even existed that Carrick could be found to have violated given that it was never reduced to writing or entered of record. *See, e.g.*, *Bartley v. State*, 73 Ark. App. 452, 45 S.W.3d 387 (2001) (noting that a form providing notice that the appellant must appear at his arraignment with an attorney "was not a court order in that it was neither signed by a judge nor filed for record."); *see also Watts v. State*, 2016 Ark. App. 16, ___ S.W.3d ___ (Where no initial sentencing order had ever been entered placing the defendant on probation, her probation could not thereafter be revoked because an oral order is simply not effective until entered of record.). Of course not every order must be in writing, e.g., where contemptuous behavior is committed in the immediate view and presence of the court. The dissent points to *Thacker v. State*, 2015 Ark. App. 573, as an example of this court's "affirm[ing] the circuit court's use of direct contempt power where a witness refused to comply with the court's *oral* direction to pull up his pants." (Emphasis in original). This court actually affirmed the trial court's refusal to grant the appellant's motion for a mistrial on the basis that her alibi witness was taken into custody for contempt in front of the jury, which the appellant argued was an improper comment on the evidence. In that case, the alibi witness's pants "were 'dragging' again" as he rose from the witness stand to leave the courtroom. That case is readily distinguishable, however, in that it involved *direct* criminal contempt because the contemptuous behavior occurred in front of the judge and jury. Here, we are dealing with *indirect* criminal contempt.

order, we may look beneath the order and recognize substantive error as a defense to contempt."[4] *Etoch v. State*, 332 Ark. 83, 88, 964 S.W.2d 798, 801 (1998). To the extent that there was a decisive order definite in its terms, in looking behind this order, we hold that the trial court had no authority to direct Carrick to hire an attorney because it would have effectively denied him his right to self-representation and, thus, constituted substantive error.

### 1. *Right to Self-Representation*

The Sixth Amendment right to the assistance of counsel implicitly embodies a "correlative right to dispense with a lawyer's help." *Faretta v. California*, 422 U.S. 806, 814 (1975) (quoting *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1943)). Forcing a lawyer on an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so. *Faretta*, 422 U.S. at 817. Here, the record shows that the judge had conducted a *Faretta* inquiry prior to trial and determined that Carrick had made a knowing and intelligent waiver of his right to counsel, thus permitting him to proceed pro se. At the second report-on-attorney hearing, however, the judge ruled that Carrick was "incompetent" to represent himself.[5] Considering what the judge had said at the first hearing,

---

[4]Although not discussing the exception to the general rule, the following is an example of an appellate court looking behind and reversing a trial court's contempt order: *Norton v. Taylor*, 299 Ark. 218, 772 S.W.2d 316 (1989) (reversing criminal-contempt finding for disobeying court order that appellant attorney represent a nonindigent defendant because trial court had no authority under those particular circumstances to make the order and where administration of justice would not have been disrupted given that appellant had allowed sufficient time for defendant to obtain other counsel).

[5]In *Indiana v. Edwards*, 554 U.S. 164 (2008), an attorney was forced on Edwards despite his repeated requests to represent himself. Noting that the rights in *Faretta* are not absolute, the Supreme Court held that the United States Constitution "permits states to insist

the judge's use of the word "incompetent" must have pertained to Carrick's lack of legal knowledge and skill. *Faretta* plainly provides, however, that technical legal knowledge is not relevant to an assessment of a defendant's knowing exercise of the right to defend himself. *Id.* at 836. As such, the trial court's refusal to permit Carrick to represent himself was based on irrelevant concerns.[6]

In *Barnes v. State*, 258 Ark. 565, 528 S.W.2d 370 (1975), Barnes assured the trial court that he would retain counsel; he hired an attorney but then sought to fire that attorney on the day before trial; and, while he had previously rejected offers of an appointed attorney, he later accepted the representation. On the day of trial, however, Barnes requested that he be permitted to represent himself because he had been "lied to" and "deceived" by the attorneys. The trial court inquired into Barnes's knowledge of basic rules of evidence and trial procedure and concluded that he knew nothing about such things and was not qualified to represent himself. The court ultimately permitted Barnes to read an opening statement,

---

upon representation by counsel for those who suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Edwards*, 554 U.S. at 171. In *Johnson v. State*, 2015 Ark. App. 677, 476 S.W.3d 807, the trial court had denied Johnson's request to represent himself based on his lack of legal knowledge and skill, as well as a mental evaluation indicating that Johnson was mildly mentally retarded and suffered from schizoaffective disorder. Distinguishing *Edwards*, this court reversed and remanded for a new trial because Johnson did not suffer from *severe* mental illness and his limited legal experience was irrelevant. Here, there is no evidence or suggestion that Carrick suffers from any mental illness that would render him incompetent to represent himself.

[6]The dissent refers to Carrick's "revocation of his right to self-representation" and states that he "rescinded his invocation of the right to self-representation." Read in context, it is obvious that Carrick only "requested" an attorney out of utter frustration. In any event, the dissent cites no authority to support the suggestion that Carrick was not permitted to change his mind.

conduct voir dire, and make a closing argument, but the court refused to permit him to examine witnesses. Barnes protested the assistance of a public defender and asserted that he had a constitutional right to examine witnesses, but the court refused to grant his request.

On appeal, the supreme court noted that the *Faretta* Court had concluded that "a state may not constitutionally [hale] a person into its criminal courts and there force a lawyer upon him when he insists that he wants to conduct his own defense." *Barnes*, 258 Ark. at 570, 528 S.W.2d at 374. In reversing the trial court, the Arkansas Supreme Court pointed out that

> Even though we might agree with the trial court, the public defender, our attorney general, and the dissenters in *Faretta* that such an election is pure folly and that only confusion can result, the test whether the election has been intelligently made is not the wisdom of the decision or its effect upon expeditious administration of justice. His technical legal knowledge is totally irrelevant in the assessment of his knowing exercise of the right to defend himself. The record here clearly discloses that the circuit judge pointed out to the defendant his lack of knowledge of procedures and rules of evidence and the hazards attendant upon his choice. Barnes' request was not refused because it was not knowingly and intelligently made. It was refused in an effort to protect Barnes from his ignorance as to rules of evidence and procedures in presenting evidence.

*Id.* at 570–71, 528 S.W.2d at 374.

Here, at both report-on-attorney hearings, Carrick's intent to represent himself was clear and unequivocal. He had already been made aware of the dangers of self-representation prior to trial. His lack of knowledge of the law, court procedures, and jury instructions—the trial court's basis for refusing to permit Carrick to represent himself—was irrelevant to whether he had made another knowing and intelligent waiver of his right to counsel. We conclude that the trial court did not have the authority to order Carrick to hire an attorney because such an order would have effectively denied him his right to self-representation. The

trial court erred in this regard and otherwise erred in holding Carrick in criminal contempt.

### B.   Carrick's Behavior Was Not Disorderly, Contemptuous, or Insolent

We do not believe that there is any substantial evidence that Carrick displayed behavior that was disorderly, contemptuous, or insolent in asserting his right to defend himself. *See Faretta*, *supra*. While it is true that Carrick persisted in his desire to represent himself, "a court must recognize the difference between forceful advocacy under difficult circumstances and contemptuous behavior. A court must recognize that making a record necessitates questioning a decision, and this is not contemptuous argument."[7] Carrick was unyielding in his desire to represent himself, but the record does not disclose that he was rude or disrespectful in expressing that continued desire. In fact, the record reveals that Carrick was polite, and even deferential, and that he did not interrupt the judge.

### C.   Carrick Did Not Disobey or Resist the "Jury-Trial Process"

We fail to see how the "jury-trial process" was disobeyed or resisted by Carrick. It appears that any delay was brought about by the judge himself in offering Carrick time to either retain counsel or accept court-appointed counsel. Also, to the extent that Carrick disrupted a jury trial at the outset, we note that it is not uncommon for seasoned attorneys to request and be granted a continuance on the day of trial, especially where, as here, there is no objection by the State. Further, the so-called contemptuous behavior occurred at two report-on-attorney hearings, the purpose of which was to hear Carrick's progress on retaining counsel or accepting court-appointed counsel. Carrick's insistence on representing

---

[7]*Hodges*, 321 Ark. at 27, 901 S.W.2d at 11 (Arnold, S.J., dissenting).

himself did not obstruct or interrupt the "jury-trial process," considering the purpose of those hearings and Carrick's assertion that he was ready to proceed pro se.

### III.   *Conclusion*

In *Clark v. State*, 291 Ark. 405, 725 S.W.2d 550 (1987), the supreme court cited with approval the following language from *In re Larry Little*, 404 U.S. 553, 555 (1972):

> [T]he vehemence of the language used is not alone the measure of the power to punish for contempt. The fires which it kindles must constitute an imminent, not merely a likely, threat to the administration of justice. The danger must not be remote or even probable; it must immediately imperil. . . . Trial courts . . . must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice.

*Clark*, 291 Ark. at 408, 725 S.W.2d at 553 (internal citations omitted).

Carrick's persistence in wanting to represent himself posed no immediate threat to the administration of justice. To summarize, there was no decisive order definite in its terms. Nevertheless, to the extent that there was, we may look behind it to recognize substantive error in the trial court's unauthorized attempt to order Carrick to hire an attorney because such an order would have effectively denied him his right to self-representation.[8] Therefore, we hold that the trial court erred in this regard and otherwise erred in holding Carrick in contempt for all of the reasons stated above. Accordingly, we reverse and dismiss.

Reversed and dismissed.

HARRISON, GLOVER, HIXSON, and HOOFMAN, JJ., agree.

---

[8]The dissent asserts that the majority opinion stands for the proposition that litigants may defy court orders with impunity. The focus of our opinion, however, should be on the rare application of an exception and the reining in of a judge who, in this instance, attempted to take his contempt power too far.

SLIP OPINION

KINARD, J., concurs.

GLADWIN, C.J., and ABRAMSON and WHITEAKER, JJ., dissent.

**M. MICHAEL KINARD, Judge, concurring.** I fully agree with the majority opinion and join in it. There was no clear and definite order requiring appellant to hire an attorney and bring him or her to court and, hence, no contumacious violation of any such order.[9] Even had there been such an order, the trial court would have been without "authority" to have entered it "under the circumstances presented here,"[10] i.e., the trial court did so simply because appellant was not learned in the law and despite the lack of any showing that appellant was "incompetent" under the standard of *Faretta v. California*, 422 U.S. 806 (1975), and its progeny. Nor was there any evidence that appellant misbehaved in court to an extent that would support a finding of direct contempt.

However, regardless of the differences expressed in the majority and dissenting opinions as to whether appellant either violated a clear court order or was disruptive in the courtroom, the one thing that is abundantly clear in this case is that the trial judge's manner

---

[9]It is beyond dispute that no *written* order on the subject was ever entered. Moreover, as the majority opinion makes plain in its extensive quotation of the colloquies between the court and appellant, the only clear *oral* direction by the trial court was that appellant would not be allowed to represent himself at trial. Again and again, the court stated that, "one way or another," whether appointed or retained, appellant would "have a lawyer." Indeed, that was also the last statement made by the trial court at the last court appearance before the one at which appellant was held in contempt. There was no clearly expressed requirement that appellant bring an attorney to court with him. As further demonstrated in the majority opinion, it was not even decided that appellant did not qualify for an *appointed* lawyer until literally seconds before the contempt finding.

[10]The standard used by the supreme court in *Norton v. Taylor*, 299 Ark. 218, 219, 772 S.W.2d 316, 317 (1989), to allow it to go behind the contempt order.

14

in communicating to appellant; his absolute refusal to even consider appellant's request that

the judge review the leading United States Supreme Court opinion on the subject at hand;

and his decision to summarily hold appellant in contempt for conduct committed outside of

court,[11] without notice of the charge and an opportunity for a hearing as required by both

the Constitution and statute, were inexcusable.  This court should say so, just as it and the

Arkansas Supreme Court have in the past regarding another judge.  *Lilly v. Earl*, 299 Ark.

103, 771 S.W.2d 277 (1989); *Arkansas Department of Human Services v. Shipman*, 25 Ark. App.

247, 756 S.W.2d 930 (1988).

My quarrel at this point is not with the fact that the trial judge was mistaken regarding

the law about self-representation.  *See Faretta*, *supra*.[12]  My problem is with the judge's

reaction to appellant's attempt to assert his constitutional right.

**PHILLIP T. WHITEAKER, Judge, Dissenting.** I respectfully dissent from the

majority opinion. Appellant Calvin Carrick's appeal is taken from an order finding him in

---

[11]An allegation of contempt that will require proof regarding willfulness is, at most, an issue of indirect contempt and demands notice of the charge and an opportunity for a hearing.  Where, as with appellant's failure to retain an attorney, the trial court "cannot ascertain by its own observations and without inquiry the operational facts from which an inference of willfulness can be drawn . . . , since an innocent explanation (if any existed) would depend on events outside the court," the case is not appropriate for a summary contempt determination.  John E. Theuman, Annotation, *Attorney's Failure to Attend Court, or Tardiness, as Contempt*, 13 A.L.R.4th 122, 163 (1982).  That has been described as the majority view and as being consistent with Arkansas law on the subject.  *Allison v. DuFresne*, 340 Ark. 583, 12 S.W.3d 216 (2000).

[12]Of course, the trial judge's words did make the situation worse.  The irony is palpable in the judge's lecture to appellant regarding the "fact" that lawyers "know the law." In this case, it was the layman who knew the law regarding the right to self-representation under the Sixth Amendment.

criminal contempt. That order, therefore, should be the proper focus of this appeal. Carrick's sole argument on appeal is that the circuit court did not have the authority to hold him in contempt because the court's actions deprived him of his Sixth Amendment right to represent himself. Because I believe the circuit court in this case had the authority to find Carrick in contempt, and issued a clear order that was then flagrantly disobeyed, I would affirm the circuit court's contempt citation against Carrick.

Because Carrick challenges the authority of the court to find him in criminal contempt, I begin by taking a look at the law regarding a court's authority in this regard. Under Arkansas Code Annotated section 16-10-108(a)(1) (Repl. 2010), every court of record shall have power to punish, as for criminal contempt, persons guilty of "[d]isorderly, contemptuous, or insolent behavior committed during the court's sitting, in its immediate view and presence, and directly tending to interrupt its proceedings or to impair the respect due to its *authority*." (Emphasis added.) Likewise, under Arkansas Code Annotated section 16-10-108(a)(3), every court of record shall have power to punish, as for criminal contempt, persons guilty of "willful disobedience of any process or order lawfully issued or made by it." Further, under Arkansas Code Annotated section 16-10-108(c), a court has the authority to summarily punish contemptuous acts committed in the immediate view and presence of the court. There is a legitimate and logical reason for these legal principles: criminal contempt preserves the power of the court, vindicates its dignity, and punishes those who disobey its orders. *Stilley v. Univ. of Ark. at Fort Smith*, 374 Ark. 248, 287 S.W.3d 544 (2008).

Clearly, the circuit court held the authority to punish contemptuous behavior

committed in its presence, held the authority to punish willful disobedience of a lawful order, and held the authority to do so summarily. Despite these principles, Carrick argues that the court did not have such authority. Essentially, he argues that (1) he has a Sixth Amendment right to represent himself, (2) all he was doing was asserting this right, and (3) the court found him in contempt for asserting his constitutional right. While he frames these arguments as a challenge to the court's authority, in reality they are a challenge to the correctness of the court's rulings. Carrick mistakenly equates authority with correctness. A challenge to the authority of a court to act and a challenge to the correctness of a court's ruling are not the same thing. When the two are mistakenly conflated, it leads to a misapplication of our standard of review, which is what I believe the majority opinion has done.

The standard of review in a case of criminal contempt is well settled: an appellate court views the record in the light most favorable to the trial judge's decision and sustains that decision if it is supported by substantial evidence. *Conlee v. Conlee*, 370 Ark. 89, 257 S.W.3d 543 (2007). Substantial evidence is evidence of a sufficient force and character to compel a conclusion one way or the other, forcing the mind to pass beyond suspicion or conjecture. *James v. Pulaski Cty. Circuit Court*, 2014 Ark. 305, 439 S.W.3d 19; *Witherspoon v. State*, 322 Ark. 376, 909 S.W.2d 314 (1995). Where a person is held in contempt for failure or refusal to abide by a judge's order, the reviewing court will not look behind the order to determine whether it is valid. *James*, *supra*.

The majority accurately recites the standard of review and the general rule that we will not look behind an order to determine whether it is valid. The majority goes on, however,

17

to avoid the general rule by attempting to apply an exception. The majority devotes considerable time to examining the application of *Faretta v. California*, 422 U.S. 806 (1975), in the context of Carrick's case. The cases on which the majority relies, however, address violations of a defendant's right to self-representation in the context of a direct appeal from the denial of that right. *See Johnson v. State*, 2015 Ark. App. 677, 476 S.W.3d 807; *Barnes v. State*, 258 Ark. 565, 528 S.W.2d 370 (1975). Neither of those cases presented the issue that is before us in this appeal: whether a defendant may be held in contempt for refusing to abide by a directive of the circuit court.

Admittedly, almost every general rule has an exception, including our general rule that we will not look behind an order to determine whether it is valid. Our supreme court has noted that, if a contemnor was making a legitimate and successful challenge to the validity of the order, the appellate court may look beneath the order and recognize substantive error as a defense to contempt. *See Etoch v. State*, 332 Ark. 83, 88, 964 S.W.2d 798, 801 (1998). "However, where the contemnor merely refused to comply with an order that was clearly *within the court's jurisdiction and power*, we will not look behind that order." *Id.* (emphasis added). As an example of an appellate court looking behind and reversing a trial court's contempt order, the majority opinion cites to *Norton v. Taylor*, 299 Ark. 218, 772 S.W.2d 316 (1989). In *Norton*, the court found an attorney in contempt for disobeying an order to represent a nonindigent defendant. The supreme court reversed the contempt, holding that the court lacked authority to issue the order.

I believe that the exception set forth applies only to cases where the challenge is to the

authority or jurisdiction of the court to enter the order and does not apply to matters, such as that presented herein, where the challenge is to the correctness of the court's ruling. Here, the court clearly had the authority to preside over criminal matters. Within that capacity, the court had the authority to make a determination concerning Carrick's Sixth Amendment right to represent himself or the termination of that right.[13] Likewise, the court had the authority to make determinations concerning Carrick's indigency and whether he qualified for the appointment of counsel. Further, the court had the authority to control its docket by directing Carrick to return to court with counsel. Because the court acted within its authority, the exception does not apply, and I disagree with the majority's decision to do so.

Applying the correct standard of review, the record viewed in the light most favorable to the circuit court's decision shows the following events. Carrick appealed his district court conviction to the Pulaski County Circuit Court and requested a jury trial. On the day of trial, Carrick advised the court that he intended to represent himself. The court conducted an inquiry under *Faretta*, *supra*, and found that Carrick had knowingly and voluntarily waived his right to counsel.

Before trial began, however, Carrick and the court became embroiled in a discussion over jury instructions. During that discussion, the court observed that Carrick did not appear to understand the concept of an affirmative defense or the fact that it was Carrick's burden to

---

[13]The right to self-representation is not absolute and may be terminated in situations where a defendant has demonstrated disruptive behavior or used the right as a tactic for delay, for disruption, for distortion of the system, or for manipulation of the trial process. *See Brown v. Gibson*, 2012 Ark. 285, at 4, 423 S.W.3d 34, 37 (citing *Monts v. Lessenberry*, 305 Ark. 202, 806 S.W.2d 379 (1991) (per curiam)).

SLIP OPINION

prove such a defense. Carrick advised the court, "Sir, I think I will need a lawyer . . . because I don't understand what's going on." The court agreed and accepted Carrick's revocation of his right to self-representation. The court dismissed the jury and directed Carrick to return on December 4, 2014, with counsel.[14]

On December 4, 2014, Carrick returned to court as directed but without counsel. Carrick attempted to reassert his right to self-representation. The court denied this attempt, stating that it was "not going down that road again," but the court instructed Carrick to visit with the public defender concerning his qualifications for appointment of counsel. The public defender later informed the court that Carrick refused to sign the affidavit of indigency because he felt that he could afford an attorney. The court then directed Carrick to return on December 11, 2014, with an attorney.

On December 11, Carrick appeared once more without an attorney. Despite the court's previous ruling concerning self-representation, Carrick told the court that he was representing himself. The court stated, "No, you're not. We plowed that field and you are incompetent to represent yourself and therefore, you will not represent yourself." The court again directed Carrick to talk with the public defender to determine whether he qualified for the public defender's services. At this point, Carrick wanted to argue with the court to the point that the court cautioned him, "Do not [interrupt] me, Mr. Carrick, when I'm talking. I will not tell you this one other time." Once more, Carrick refused to complete the affidavit

---

[14] In its "Order of Criminal Contempt," the court stated, "After finding the Defendant is not competent to represent himself, the Court released the jury and ordered the Defendant to appear on December 4, 2014, with counsel."

of indigency. Carrick told the court that he would not fill out a form saying that he was "requesting" a lawyer, because he was not requesting a lawyer; the court agreed to amend the form so that it did not use the language to which Carrick objected but would instead merely recite that the court was appointing counsel for Carrick. Ultimately, the court had to inquire, on the record, whether Carrick had sufficient funds to hire an attorney. Carrick initially balked at answering the court's questions, attempting to invoke a Fifth Amendment right against self-incrimination. Carrick eventually informed the court that he owned his home and several automobiles outright, had no dependents, and had several tens of thousands of dollars on deposit in various banks. The court found that Carrick did not qualify for the services of a public defender.

I believe that, on the facts set out above, substantial evidence supports the court's finding that Carrick was in contempt. As noted in the majority opinion, before a person may be held in contempt for violating a court order, the order must be in definite terms as to the duties imposed, by expressed commands rather than implied. *Hodges v. Gray*, 321 Ark. 7, 901 S.W.2d 1 (1995). The majority opinion takes the position that the court's directive was not entirely clear. I disagree. The court expressly directed Carrick to return to court on dates certain with an attorney. This has every appearance of being an expressly defined command. There is no question that Carrick did not comply with this expressly defined command. What Carrick did do was to engage in behavior that was an attempt to wield his right to self–representation in order to manipulate the process of his criminal proceedings.

Despite the court's determination that Carrick was unable to represent himself and its

repeated, clear orders directing Carrick to either hire an attorney or cooperate with the public

defender, Carrick refused to do either and insisted that he would represent himself. Carrick's

repeated refusal to abide by the court's instructions, his recurring appearances before the court

without counsel, and his persistent quarreling with the court clearly constituted "disorderly,

contemptuous, or insolent behavior" that warranted the court's contempt finding. Arkansas

law is settled that an act is contemptuous if it interferes with the order of the court's business

or proceedings or reflects upon the court's integrity. *Perroni v. State*, 358 Ark. 17, 186 S.W.3d

206 (2004); *Allison v. DuFresne*, 340 Ark. 583, 12 S.W.3d 216 (2000). Our supreme court has

also held that the disobedience of any judgment, order, or decree of a court having

jurisdiction to enter it is such an interference with the administration of justice as to constitute

contempt. *Ivy v. Keith*, 351 Ark. 269, 92 S.W.3d 671 (2002).

The majority nonetheless suggests that "there is some question whether a lawful order

even existed," noting that the circuit court's directive for Carrick to hire an attorney was

never reduced to writing and entered as of record. In raising this proposition, the majority

cites *Watts v. State*, 2016 Ark. App. 16, ___ S.W.3d ___, as holding that "an oral order is

'simply not effective until entered of record.'" 2016 Ark. App. 16, at 3. *Watts*, however, was

clearly referring to the entry of a judgment and commitment order, as it held that a

defendant's probation could not be revoked when there was never an order of record

sentencing her to probation. Clearly, one may be held in contempt for refusing to abide by

a direct court order, even where that order was never reduced to writing. For example, in

*Thacker v. State*, 2015 Ark. App. 573, this court affirmed the circuit court's use of direct

contempt power where a witness refused to comply with the court's *oral* direction to pull up his pants. *Watts* is simply inapplicable to the case at bar.

Because a defendant must be represented in such proceedings, because Carrick did not qualify for the services of the public defender, and because Carrick had both rescinded his invocation of the right to self-representation and been found incompetent to represent himself, I do not believe that the circuit court lacked the power or authority to order Carrick to obtain counsel. Given that the court possessed the jurisdiction to enter such an order, the majority errs when it looks behind the order to determine its validity. Ultimately, the majority opinion stands for the proposition that a defendant can defy a clear court directive, become argumentative with the court, use coy and intemperate behavior in the court's presence, and yet not be held in contempt. In looking behind the court's order, the majority is allowing the exception to swallow the rule. I therefore dissent.

GLADWIN, C.J., and ABRAMSON, J., join.

*Calvin Carrick*, pro se appellant.

*Leslie Rutledge*, Att'y Gen., by: *Christian Harris*, Ass't Att'y Gen., for appellee.